IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THOMAS D. SYKES,                          )
                                          )
                    Plaintiff,            )
                                          )
          v.                              )        Civil Action No. 06CV0829 (CKK)
                                          )
JON W. DUDAS, IN HIS OFFICIAL             )
CAPACITY OF THE                           )
UNITED STATES PATENT AND                  )
TRADEMARK OFFICE, AN AGENCY IN            )
THE UNITED STATES DEPARTMENT              )
OF COMMERCE,                              )
                                          )
                    Defendant.            )
_____)

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
(1) IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND (2) IN SUPPORT OF
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

_____

In 1993, Plaintiff invented a mechanical device: a thigh-top platform for a computer

mouse. In January 1994, with the assistance of a patent attorney, he filed an application for a

U.S. utility patent, making a detailed disclosure of his invention in drawings and a narrative (the

"specification") set out in that application. At the time he filed that application (serial no.

08/180,202 – hereinafter the "'202 Application" or "the Parent Application"), U.S. patents were

entitled to a 17-year term, running from the date of the eventual issuance of the patent.

After reviewing the '202 application, the USPTO determined that it actually described

several different species of the invention. To prevent inventors from circumventing the USPTO

fee schedule, the USPTO has a procedure whereby it requires an inventor to file separate

"divisional" applications – and pay additional fees -- for the various inventions that are disclosed

in a single application. This procedure is known as a "restriction requirement." Under this

procedure, the USPTO directed Plaintiff to select one species, from among the various species,

to pursue in the '202 case, and allowed Plaintiff to file "divisional" applications if it wished to

pursue other species of the invention set out in the '202 Application.[1]

On May 22, 1996, in the wake of the USPTO's restriction requirement, Plaintiff filed its

"Preliminary Amendment for Divisional Application." A0600 though A0612; A0613 through

A0616.[2]  This application (the "Divisional Application" or the "'431 Application") was directed

solely to the subject matter described and claimed in the parent application. *See id.  See also*

A0611 (electing the species of the invention drawn to Figures 1-5 for prosecution).

On November 8, *2005* – nine years and six months after the Divisional Application was

filed, and twelve years and four months after the Parent Application was filed -- the USPTO

issued to Plaintiff patent no. 9,963,311 (the "'311 Patent"). On the first page of that issued

patent (attached to the Complaint as Exhibit 1), the USPTO stated that "the term of this patent is

---

[1]  Plaintiff's Complaint (paras. 10, 11, and 12) and First Amended Complaint (paras. 11, 12, and 13) seek review of the administrative record that has a bearing on the issue at hand – including those parts of the record that were generated in connection with '202 Application. Defendant, however, has unilaterally chosen not to include any records from the '202 Application – despite the clear position to the contrary taken by Plaintiff in the Complaint and the First Amended Complaint. See pages 2-4 of Memorandum of Points and Authorities Supporting Defendant's Motion to Dismiss, Or In the Alternative, For Summary Judgment (Doc. 13-1) (hereinafter "Deft. Mem." or "Defendant's Memorandum"); Notice of Filing of Administrative Record (Doc. 12). Defendant admits that only the record pertaining to the '431 Application (and the '311 Patent) has been filed. Deft. Mem. 2 n.2. Defendant is not permitted to shield certain aspects of the record from the Court.    Plaintiff respectfully requests that the Court order Defendant to file, forthwith, the record pertaining to the '202 Application.

[2]  The pages of the administrative record filed by Defendant on November 13, 2006 (see Doc. 12) is cited herein as A0001 (the first page of the record), A0002 (the second page of the record), and so on. Thus, A0600 refers to the 600th page of the administrative record filed by Defendant.

extended or adjusted under 35 U.S.C. 154(b) by 1139 days." This statement is an assertion by the USPTO that the patent does not have a 17-year term (running from the date of *issuance* of the patent), but instead a 20-year term (running from the date of the *Parent Application*), extended by 1139 days.

Dissatisfied with the USPTO's decision that his '311 Patent (associated with the '431 Application) is not entitled to a 17-year term running from the date of issuance, Plaintiff timely brings this action and asks the Court to order the USPTO allow a 17-year term. In the alternative, Plaintiff requests the Court to extend any 20-year term by 1798 days (rather than by 1139 days). The consequences of this suit for the coverage provided by the '311 Patent are very real. If Plaintiff is correct that a 17-year term is proper, the '311 Patent does not expire until November 2022. If the USPTO is correct that a 20-year term is proper (as extended by 1139 days), Plaintiff's patent coverage expires in early 2017 – almost six years earlier. More important, under the USPTO's approach, Plaintiff would receive slightly less than 12.5 years of patent coverage for his invention – not the 17 years that was provided by law when he disclosed his invention by filing the '202 Application.

In response to the First Amended Complaint, Defendant filed a motion to dismiss for lack of subject-matter jurisdiction or for failure to state a claim. In the alternative, Defendant moved for summary judgment. In response to these motions, Plaintiff has cross-moved for summary judgment. The instant Memorandum is submitted in opposition to Defendant's motions, and in support of Plaintiff's motion for summary judgment.

Although it is customary for a jurisdictional issue to be discussed first in a brief, Plaintiff will address Defendant's jurisdictional motion after Plaintiff has discussed the parties' summary

judgment motions. Those motions provide the information and context that are necessary for a proper understanding of the jurisdictional issue.

This Memroandum will first show that Defendant's motion to dismiss for failure to state a claim is not only meritless, but frivolous. Second, this Memorandum will show that Plaintiff was entitled to a 17-year term for his '311 Patent, running from the date of *issuance* – and that Plaintiff is entitled to summary judgment on that issue. Third, Plaintiff will show that the Court has jurisdiction over the subject-matter of Plaintiff's request for a 17-year term. Finally, this Memorandum will show that if Plaintiff somehow is not entitled to the 17-year term he seeks, Plaintiff is, in any event, entitled to have 1798 days added to his 20-year term, rather than the 1139 days determined by the USPTO. (Defendant does not dispute that the Court has jurisdiction over that issue.)

## FACTS

The facts relevant to this matter are set out in Plaintiff's Statement of Material Facts as to Which There Is No Genuine Issue, submitted herewith. Plaintiff is also filing herewith Plaintiff's Response to Defendant's Statement of Undisputed Facts. The facts, with record citations, are also woven into the argument below where helpful to an understanding of the issues.

## LAW AND ARGUMENT

## I. Defendant's Motion to Dismiss for Failure to State a Claim Is Frivolous and Should Be Denied

Defendant has moved to dismiss this action under Fed. R. Civ. P. 12(b)(6), contending that Plaintiff's complaint is insufficient. Deft. Mem. 16-18. Defendant contends:

Plaintiff's complaint does not provide a short and plain statement of events. Plaintiff's complaint does not identify any particular error in the PTO's petition decisions. Moreover, plaintiff does not explain why he should prevail. Instead, he merely alleges that he is "dissatisfied," . . . and that the PTO's determination is "erroneous and unlawful or [sic] the reasons set out in the Petition and the exhibits thereto, and for reasons appeal appearing in the whole record. . . . ." See First Amended Complaint ¶ 11.

Deft. Mem. 16-17. Defendant also contends that "the complaint does not set forth any theory of recovery whatsoever . . . ." Deft. Mem. 17. Finally, Defendant contends that "the Complaint consists of nothing but conclusory allegations." Deft. Mem. 18.

Defendant's contentions are frivolous. In paras. 6-10, Plaintiff describes the USPTO determinations with which he his dissatisfied.[3] The First Amended Complaint ((Doc. 10) specifically identifies those determinations by date, and attaches copies of those determinations to the Complaint, as Exhibits 2, 3, and 5. First Amended Compl. ¶¶ 7, 8, and 10. In the final paragraph of the First Amended Complaint, Plaintiff is very precise about the relief that he seeks: a 17-year term running forward from the date of the issuance of the '311 Patent, or, in the alternative, a 20-year term that is adjusted and extended by 1798 days (or any greater number of days to which he may be entitled).

Plaintiff makes sufficiently clear his reasons "why" the USPTO's various determinations are, as alleged, "erroneous and unlawful" Paragraphs 11, 12, and 13 of the First Amended Complaint aver that the "reasons [are] set out in the Petition [Under 37.C.F.R. 1.182 Or In The Alternative Under 1.183] and the exhibits thereto," and the reasons "appear[] in the whole record (including USPTO Serial Nos. 08/180,202 and 08/651,431)." A copy of that Petition, to which

---

[3]  Defendant fails to appreciate that 35 U.S.C. § 154(b)(4)(A) permits review, in this Court, of a USPTO patent-term determination when "an applicant [is] dissatisfied . . . ." Plaintiff's choice of the word "dissatisfied" was not accidental.

the First Amended Complaint expressly refers, is attached to the Complaint as Exhibit 4.  It should be noted that Exhibit A to that Petition is 23 pages long and reads like a legal brief.

Accordingly, Plaintiff has specifically identified the determinations by the USPTO with which he is dissatisfied – and indeed, attached copies of those documents to his Complaint; he has set forth, in a brief-like document attached to the Complaint, his argument as to why he is entitled to prevail; and he has set forth the relief he requests.

Nothing else was required -- and considerably less would have been sufficient.  Chief Judge Posner, writing for the Seventh Circuit, held in *Kirksey v. Reynolds Tobacco Co.,* 168 F.3d 1039, 1041 (7th Cir. 1999), that "[t]he courts keep reminding plaintiffs that they don't to [sic] have to file long complaints, don't have to plead facts, don't have to plead legal theories."  The court noted that the complaint was "admirably succinct."  168 F.3d at 1041.  "All that need be specified is the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer." *Higgs v. Carver,* 286 F.3d 437, 438 (7th Cir. 2002) (Posner, C.J.).   Here, Defendant has not sought a more definite statement from Plaintiff under Rule 12(e).  Instead, Defendant has moved for summary judgment, in a brief that attempts to refute Plaintiff's positions.

Defendant's motion to dismiss under Rule 12(b)(6) is frivolous.  It should be denied.

## II. Under 35 U.S.C. §§ 154(c)(1), Plaintiff Is Entitled to a 17-Year Term from the Date of the Issuance of the '311 Patent Because That Patent "Results From" the '202 Application, Filed on January 11, 1994

### A. The Uruguay Agreements Legislation

Legislation altering the terms of utility patents was enacted in December 1994 by §§ 531 through 534 of the Uruguay Round Agreements Act, Pub. L. 103-465, 103rd Cong., 2nd Sess.,

108 Stat. 4809 ("Uruguay Agreements legislation"). Broadly speaking, that legislation was designed to shift the terms of U.S. patents from 17 years from the date of the grant of the patent (the term prevailing under the regime that existed before the Uruguay Agreements legislation – see former 35 U.S.C. § 154) *to* a term of 20 years from the date of the filing of the first application. 35 U.S.C. § 154(a)(2) (enacted by § 532(a) of the Uruguay Agreements legislation).

Section 534 of the Uruguay Agreements legislation set out the overall effective date of the patent provisions of the legislation, providing as follows (italics added):

### SEC. 534. EFFECTIVE DATES AND APPLICATION.

(a) IN GENERAL. – Subject to subsection (b), the amendments made by this subtitle [concerning patents] take effect on the date that is one year after the date on which the WTO Agreement enters into force with respect to the United States.

(b) PATENT APPLICATIONS. –

(1) IN GENERAL. – Subject to paragraph (2), the amendments made by section 532 take effect on the date that is 6 months after the date of the enactment of this Act and shall apply to all patent applications filed in the United States on or after the effective date.

(2) SECTION 154(a)(1). -- Section 154(a)(1) of title 35, United States Code, as amended by section 532(a)(1) of this Act, shall take effect on the effective date described in subsection (a).

(3) EARLIEST FILING. -- The term of a patent granted on an application that is filed on or after the effective date described in subsection (a) and that contains a specific reference to an earlier application filed under the provisions of section 120, 121, or 365(c) of title 35, United States Code, shall be measured from the filing date of the earliest filed application.

Because Plaintiff's '431 Application was filed on May 22, 1996, § 534(b)(1) makes the Uruguay Agreements legislation applicable to Plaintiff's proceeding.[4]  The inquiry at hand does not end here, however.

### B. The Transition Rules Under the Uruguay Agreements Legislation

Under 35 U.S.C. § 154(c)(1), enacted by § 532(a) of the Uruguay Agreements legislation and entitled "Continuation -- . . . Determination," an inventor whose patent application is governed by the Uruguay Agreements legislation is entitled to a patent term that is *the greater of* the 20-year term as provided in § 154(a) or 17 years from the "grant" (issuance) of the patent, in the case of a patent "that is in force on or *that results from an application* filed before the date that is 6 months after the date of the enactment of the Uruguay Round Agreements Act." (Emphasis added.)   This transition rule expresses a special Congressional solicitude for inventors who have been granted a patent or filed a patent application before the effective date of the Uruguay Agreements legislation.  This transition rule has an obvious remedial purpose.

"A continuation is a second application for the same invention claimed in a prior nonprovisional application and filed before the original prior application becomes abandoned or patented." *Biogen IDEC MA Inc. v. The Trustees of Columbia University in the City of New York,* 332 F. Supp. 2d 286, 292 (D. Mass. 2004) (quoting § 201.07 of the USPTO's Manual for the Prosecution and Examination of Patents).  The '202 Application was a nonprovisional

---

[4]  Section 534(b)(3) has no control over whether Plaintiff is entitled to a 17-year term as opposed to a 20-year term.  This transition-rule provision merely addresses *when* the clock for a 20-year term begins to run under the transition rules -- not *whether* a 20-year term is applicable. As we shall see, however, the terminology used in that provision is instructive by comparison when interpreting the transition rules set out in 35 U.S.C. § 154(c)(1), discussed in detail below.

application. *See* A0613; A0621 through A0686; and A0693-A0694 (copy of '202 Application).
The '431 Application was filed before the '202 Application was abandoned. See A0600; A0615.
Thus, the '431 Application was a "continuation" and is addressed by 35 U.S.C. § 154(c)(1).

Defendant evidently does not dispute that the '431 Application was a "continuation"
application that comes within 35 U.S.C. § 154(c)(1). *See* Deft. Mem. 11 (setting out 35 U.S.C. §
154(c)(1) in a block quote).

### C. The '311 Patent "Results From" the '202 Application

*The crucial issue in this case is whether Plaintiff's '311 Patent "results from" Plaintiff's*
*'202 Application, within the meaning of 35 U.S.C. § 154(c)(1).* If it does, as Plaintiff will
demonstrate, Plaintiff's '311 Patent is entitled to a 17-year term.

**1.** Even a cursory review of the '311 Patent (attached to the Complaint as Exhibit 1)
confirms that that it "results from" the '202 Application (filed on January 11, 1994).[5] The '311
Patent discloses the specification and drawings[6] that were presented in the original application –
and none other.

---

[5] Unfortunately, Defendant has chosen not to provide to the Court, as part of the administrative
record, a copy of the file associated with the '202 Application. A copy of that Application may
be found A0621 through A0686 and A0693 through A0694, however. *See also* A0613 through
A0616.

[6] To be sure, the drawings included in the '311 Patent have been refined and now incorporate
printed reference numbers. *See* A0108 (requiring "corrected [refined] drawings"). The only
change to the "specification" of the patent is found in the introductory sentence of the '431
Application: "This application is a divisional of U.S. patent application Ser. No. 08/180,202,
which was filed on Jan. 11, 1994" – a recital that was required by 35 U.S.C. §§ 120 and 121.
Indeed, no change in the disclosures made by '202 Application was permitted if the '311 Patent
was to retain the benefit of the earlier filing date of the '202 Application. *See* 35 U.S.C. § 120.

The '431 Application filed on May 22, 1996 – the "Preliminary Amendment for Divisional Application" (A0600 through A0612) – confirms that the '311 Patent "results from" the '202 Application. That document states that it "elects the species drawn to Figures 1-5 [of the '202 Application] for prosecution in this application and presents certain claims drawn to that species." A0611. Translated, that means the '431 Application seeks the allowance of claims for the species of the invention shown in Figures 1-5 of the drawings contained in the '202 Application.[7] *See generally Gerber Garment Technology, Inc. v. Lectra Systems, Inc.*, 916 F.2d 683 (Fed. Cir. 1990) (generally discussing restriction requirements under 35 U.S.C. § 121.).

The '311 Patent provides protection for the invention disclosed in the '202 Application (filed on January 11, 1994) – and no other invention. The scope of the claims granted by the '311 Patent was determined by the disclosures made in the '202 Application – and none other. The '431 Application – entitled "Preliminary Amendment for Divisional Application" -- contains no new disclosures; it merely references the invention disclosed in the '202 Application. Because the '431 Application was directed solely at the invention disclosed in the '202 Application, Plaintiff was not required to sign or execute the '431 Application under penalty of perjury. *See* 35 U.S.C. § 121; A0665-A0665 (Declaration of Thomas D. Sykes, executed in support of the '202 Application).[8]

---

[7]  "Claims" are the part of the issued patent that define the scope of the monopoly granted by the patent.

[8]  In the USPTO proceedings respecting the '311 Patent, the Board of Patent Appeals and Interferences (BPAI) issued a directive that confirms that the patent coverage granted in the '311 Patent results from the disclosures made in the Parent Application. In its opinion issued on October 30, 2001, the BPAI directed the USPTO examiner to "determine whether any of the above-listed claim language [addressed by the BPAI in its opinion] was not disclosed in the application as filed." A0246. In that the Divisional Application made no new disclosures, the

(continued…)

**2.** "The *quid pro quo* which supports the patent grant is the requirement of a full *disclosure* regarding the invention; *indeed the very purpose of the patent system is to encourage disclosures*." *A.F. Stoddard & Co. Ltd. v. Dann*, 564 F.2d 556, 563 (D.C. Cir. 1977) (Markey, J., sitting by designation) (emphasis added). *See also University of Rochester v. G .D. Searle & Co., Inc.*, 358 F.3d 916, 922 (Fed. Cir. 2004) ("The 'written description' requirement serves a teaching function, as a 'quid pro quo' in which the public is given 'meaningful disclosure in exchange for being excluded from practicing the invention for a limited period of time'"); *Universal Oil Prod. Co. v. Globe Oil. & Refining Co.,* 322 U.S. 471, 484 (1944) (noting that disclosure is the *quid pro quo* for the monopoly provided by a patent). The '311 Patent was awarded *in exchange for* – as a result of -- the disclosure made by the '202 Application.

Plaintiff's '311 Patent thus "resulted from" the '202 Application, not the '431 Application. If a patent is the *quid pro quo* granted for disclosure of the invention, the '311 Patent cannot be viewed as "resulting from" the '431 Application. Instead, the '311 Patent resulted from the '202 Application. Therefore, 35 U.S.C. § 154(c)(1) requires that the resulting '311 Patent have a term that is the greater of a 17-year term or a 20-year term.

### D. Defendant Conflates, and Improperly Equates, Two Different Phrases Found in the Relevant Patent Statutes

Defendant conflates a patent that "results from an application" with a patent that is "granted on an application."

_____

issuance of the '311 patent (in the wake of the BPAI's directive) confirms that all of the claims in the '311 Patent are based upon the disclosures made in the Parent Application. *See generally Reiffin v. Microsoft Corp.,* 214 F.3d 1342, 1346 (Fed. Cir. 2000) (discussing the use of disclosures made in an ancestor application to obtain the benefit of the earlier filing date of the ancestor application).

"Granted on an application" is a venerable phrase that appears elsewhere in the patent statutes. *See* 35 U.S.C. § 102(e)(2) (referring to a "patent granted on an application"); 35 U.S.C. § 119(a) (referring to a patent "granted on any application").

That phrase also appears in § 534(b)(3) of the Uruguay Agreements legislation (set out above at page 7); in that section, Congress addressed *how* the 20-year term is measured for purposes of applying transition rules to patents "granted on" a divisional or continuation application (most of which will, unlike Plaintiff's '431 Application, relate to parent applications that were filed *after* the effective date of the Uruguay Agreements legislation).

By contrast, § 154(c)(1) provides that whether an inventor is entitled to the greater of a 17-year or a 20-year term depends upon whether the patent "results from" an application that was filed before the effective date of the Uruguay Agreements legislation.

The USPTO contends that the two phrases ("granted on an application" and "result[ing] from an application") mean the same thing. Obviously, there are huge problems with that position. Congress presumably meant different things when it sued different phrases. It would have been a simple matter for Congress to have used the phrase "granted on" in § 154(c)(1), had Congress wanted that statute to have that meaning. Congress did not do so.

Importantly, a "result of" phrase also appears in the long-standing statute *that addresses the treatment of divisional applications*, 35 U.S.C. § 121.[9] That statute provides, in pertinent part:

---

[9] "A later application for an independent or distinct invention, carved out of a pending application and disclosing and claiming only the subject matter disclosed in the earlier or parent

(continued...)

A patent *issuing on* an application with respect to which a requirement for restriction under this section has been made, or on an application filed *as a result of such a requirement,* shall not be used as a reference either in the Patent and Trademark Office or in the courts against a divisional application or against the original application or any patent *issued on* either of them, if the divisional application is filed before the issuance of the patent on the other application.

This statute reveals several things. First, it confirms that that Congress knows how to refer to patents that "issue on" (or are "granted on") an application (including a divisional application). Second, we see that Congress views divisional applications (such as the '431 Application) as being filed "as a result of" a restriction requirement issued with respect to a parent application (such as the '202 Application). The "result of" phrase thus describes the relationship between an application in the parent case that that was addressed by a restriction requirement, and the ensuing divisional application. The divisional application "results from" the parent application.

The "results from an application" phrase, found in 35 U.S.C. § 154(c)(1) should be read harmoniously with the "as a result of" phrase found in 35 U.S.C. § 121 – *especially because both statutes address divisional applications.*

Accordingly, the *plain text* of relevant patent statutes -- including statutes enacted by the Uruguay Agreements legislation -- blocks Defendant's effort to equate the phrase "result[ing]

---

application, is known as a divisional application or 'division.'" *Biogen IDEC MA Inc. v. The Trustees of Columbia University in the City of New York,* 332 F. Supp. 2d at 291 (quoting § 201.06 of the USPTO's Manual for the Prosecution and Examination of Patents).

from an Application," found in 35 U.S.C. § 154 (c)(1), with the phrase "granted on an application" (or its synonym,[10] "issued on an application").[11]

### E. Defendant's View Renders § 154(c)(1) Superfluous

It would have been simple for Congress to dictate the result for which Defendant contends, had Congress intended that. Congress could have simply enacted § 534(b)(1) of the Uruguay Agreements legislation -- and stopped there. That legislation provides that "the amendments made by section 532 take effect on [June 8, 1995] and shall apply to *all* patent applications *filed* in the United States on or after the effective date" of the legislation. (Emphasis added.) This short sentence, when read in conjunction with 35 U.S.C. § 154(a)(2), would have made a 20-year term applicable to Plaintiff's Divisional Application; no other statutory provision was necessary. But Congress did not stop with § 534(b)(1); instead, it also enacted 35 U.S.C. §154(c)(1) -- a transition rule.

Defendant's view thus renders 35 U.S.C. §154(c)(1) superfluous. A statutory interpretation that renders a part of the statute superfluous is disfavored, of course. *See, e.g., Duncan v. Walker,* 533 U.S. 167, 174-175 (2001) (observing that this is a "cardinal rule" of

---

[10] *See Merck & Co. v. Kessler,* 80 F.3d 1543 (Fed. Cir. 1996) (stating that "[n]o patent issued on an application filed after June 8, 1995, has a guaranteed 17-year term").

[11] The *Uruguay Round Agreements: Statement of Administrative Action,* H.R. Doc. 103-316, at 1002-1004, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4295-4297, undercuts Defendant's position. The Statement mentions the transition rule in a single sentence that certainly does not support Defendant. Notably, the Statement says nothing suggesting an intent to deprive inventors who made and disclosed an invention before the enactment of the Uruguay Agreements legislation of patent coverage for those inventions. Surely an action of that consequence would have been discussed in considerable detail in the Statement -- especially because that action would present Constitutional issues, as discussed below.

statutory construction).   Section 154(c)(1) must be interpreted in a way that gives it effect, if

possible.   To accomplish that, the Court should interpret the provision to provide Plaintiff with

the greater of a 17-year or a 20-year term.   Here, the greater term is the 17-year term.

### F.  Section 154(a)(2) Also Supports Plaintiff's Position

Although it is not a transition rule, 35 U.S.C. § 154(a)(2) provides additional support for

the Plaintiff's position.   Enacted as part of the Uruguay Agreements legislation, § 154(a)(2)

provides that the date on which the original application was filed is to control in measuring the

20-year term in situations in which a divisional or continuation application was filed.   Section

154(a)(2) views the filing date of the parent application as controlling for purposes of measuring

the 20-year term (when applicable).   *This rule strongly suggests that patent coverage in a*

*situation involving a divisional application does not "result[] from" the divisional application,*

*but instead from the parent application.*   The filing date of the divisional application is thus

viewed, by this statute, as irrelevant to the patent term – a view that is consistent with the

bedrock principle, discussed above, that patent coverage is a *quid pro quo* for disclosure (which

was made in Plaintiff's '202 Application).

As statutes that both address the same subject matter and that were enacted at the same

time, §§ 154(c)(1) and 154(a)(2) must be construed *in pari materia.*   It is inconceivable that

Congress in the same breath provided that an original application's filing date should have

controlling effect for purposes of measuring a 20-year patent term under 35 U.S.C. § 154(a)(2)

but should be irrelevant for purposes of determining whether an inventor whose disclosure was

made entirely before the effective date of the Uruguay Agreements legislation should qualify for

a 17-year term under the transition rule. Yet that is the incongruous (not to mention unfair) result that Defendant seeks.

### G.  As a Remedial Provision, § 154(c)(1) Is To Be Liberally Construed in Favor of Plaintiff

The transition rule set out in 35 U.S.C. § 154(c)(1) is part of a scheme that is plainly intended to be broadly remedial. The great breadth of the remedial intent is illustrated by the fact that an inventor making an invention, say, four months *after* the passage of the Uruguay Agreements (say, in early April 1995) and who files a patent application 45 days later (say, in mid-May 1995) is indisputably entitled, under §154(c)(1), to the longer of a 17-year term or a 20-year term. Congress thus intended powerful protection for inventors – including inventors who made and disclosed their inventions *after* the enactment of the Uruguay Agreements legislation (in December 1994). The powerful remedial purpose here is obvious and indisputable. If Congress intended to protect those hypothetical inventors (who are plainly less deserving of protection than Plaintiff), it surely intended to protect Plaintiff as well.

The broad remedial purpose is also evidenced by § 154(c)(1)'s directive that patents addressed by the provision are to have a patent term that is "the greater of" a 20-year term (running from the application) or a 17-year term (running from issuance).

As a remedial provision, § 154(c)(1) must be liberally construed in favor of Plaintiff. *See, e.g., State Farm Fire & Casualty Co. v. Tashire,* 386 U.S. 523, 533 (1967) (remedial statutes are to be liberally construed); *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 353 (1943) (same); *Fleisher Engineering & Construction Co. v. United States,* 311 U.S. 15, 18 (1940) (same). The phrase "results from," found in § 154(c)(1), may not be given the narrow, unharmonious, and patently unfair construction that Defendant seeks.

**H.  The Beneficial Purpose Behind § 121 Also Supports Plaintiff's Position**

Further support for Plaintiff's position, if any were needed, is provided by 35 U.S.C. § 121, which addresses "Divisional Applications."  That statute provides that an inventor filing a divisional application is "entitled to the benefit of the filing date of the original application."  For Plaintiff to have "the benefit of" the filing date of the Parent Application, as mandated by § 121, Plaintiff must be given the benefit of a 17-year term (when that term is greater than a 20-year term would be).  That result that follows from a completely natural reading of § 121 – and the result is consistent with § 154(c)(1), discussed above.

This result should be contrasted with the position taken by the USPTO.  It argues that Plaintiff is entitled only to a 20-year term, with the clock for that 20-year period starting to run on the filing date of the '202 Application (January 11, 1994).  Obviously, that position is not "beneficial" to Plaintiff in the least – and it is incongruous with Defendant's extremely "unbeneficial" position as to the meaning of § 154(c)(1).

Section 154(c)(1), upon which Plaintiff relies, should not be interpreted in a way that is at undercuts the beneficial purposes of § 121.

**I.  Defendant's Position Raises Serious Constitutional Issues**

An additional, powerful reason for broadly construing a transition rule respecting a patent term is that the rule, if construed to reduce the patent coverage that would have been available to Plaintiff under the regime in place before the enactment of the Uruguay Agreements legislation, would deprive Plaintiff of several rights that are of Constitutional dimension.  *See A.F. Stoddard & Co. Ltd. v. Dann,* 564 F.2d at 563-564 (discussing the Constitutional objectives of the U.S.

patent system and noting that "the very purpose of the patent system is to encourage disclosures").

Once Plaintiff had disclosed his invention under the 17-year regime (so as to avail himself of the *quid pro quo* promised by the statutes in place in January 1994 – i.e., 17 years of patent coverage), any statutory provision that is interpreted to give Plaintiff less patent coverage than the coverage statutorily promised when he made and disclosed the invention is Constitutionally dubious under Article I, Section 8, Clause 8 (pertaining to the protection and promotion of inventions), under the Due Process Clause, and under the Fifth Amendment's prohibitions against a taking without just compensation.

"[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is *plainly contrary* to the intent of Congress." *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers,* 531 U.S. 159, 173 (2001) (emphasis added; citations omitted). Section 154(c)(1) may effortlessly be interpreted in the way that Plaintiff suggests. The Court should accept that interpretation, so that the serious Constitutional issues raised by Defendant's hyper-aggressive interpretation are avoided.

Congress surely expressed nothing suggesting that it intended to treat inventors in Plaintiff's position, who made and disclosed inventions long before the passage of the Uruguay Agreements legislation, with the remarkable harshness that Defendant proposes. The *Uruguay Round Agreements: Statement of Administrative Action*, H.R. Doc. 103-316, at 1002-1004, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4295-4297, says nothing that aids Defendant. The Statement mentions the transition rule in a single sentence, but that sentence does not support

Defendant's position. Had Congress intended to deprive inventors who made and disclosed an invention before the enactment of the Uruguay Agreements legislation of patent coverage for inventions made and disclosed under the 17-year regime, Congress surely would have mentioned that intention.

### J.  Defendant's Arguments Are Meritless

Although Plaintiff's arguments were set out in considerable in Exhibit A to Exhibit 4, attached to the Complaint, Defendant's motion papers made no attempt to directly refute them, as indicated by the fact that it spends only *two pages* dealing with these arguments. Deft. Mem. 11-12. Instead, Defendant attempts, in those two pages, to sidestep Plaintiff's arguments with several of its own. Defendant's arguments are meritless.

First, Defendant appears to suggest that § 534 of the Uruguay Agreements legislation controls the result in this case. Deft. Mem. 12. Defendant knows better. As shown in Section II.B., 35 U.S.C. § 154(c)(1) sets out the transition rule that is applicable to continuation applications – as Defendant appears to recognize when it sets out, at page 11 of its Memorandum, a quote from § 154(c)(1).

Second, Defendant quotes a phrase from *Merck & Co. v. Kessler,* 80 F.3d 1543 (Fed. Cir. 1996), to the effect that "[n]o patent issued on an application filed after June 8, 1995, has a guaranteed 17-year term." Deft. Mem. 12. But *Merck* did not address the meaning of the transition rule found in § 154(c)(1), under which the crucial question is whether the patent "results from" an application filed before June 9, 1995 (and not whether a patent is "issued on an application filed after June 8, 1995").

Third, Defendant cites a 1995 article by a patent practitioner (Burchfiel). But that article is secondary authority. Deft. Mem. 12. The article makes no attempt to address the textual and other arguments upon which Plaintiff relies, set out above. Secondary authority is only as persuasive as its reasoning, and it certainly is not a source of law.

Fourth, Defendant points out that Uruguay Agreements legislation also provided for the 20-year term that would in the future be applicable could be adjusted if delays falling into any of three categories was present. Deft. Mem. 12. That argument, of course, is entirely beside the point. Those adjustments have nothing to do with the transition rule set out in § 154(c)(1). Those adjustments are available to all inventors who have a 20-year term – including inventors who invent after June 7, 1995, Having general application, those adjustments are not targeted at inventors, like Plaintiff, whose proceedings before the USPTO "straddle" the old regime and the new regime.

Fifth, Defendant emphasizes the broad reasons for the transition to a regime providing for a 20-year term from the date of application rather than for a 17-year term from the date of issuance, emphasizing that the 17-year system gave rise to misuse by inventors. Deft. Mem. 9-10. But Defendant does not allege, nor could he, that Plaintiff has attempted to abuse the

system. Rather, the abuse that exists in this case was generated by the USPTO's remarkable dithering (if not obstruction[13]) – dithering (or obstruction) that would, if Defendant has his way, reduce Plaintiff's patent coverage to a mere 12.5 years (as measured from the date of issuance).

More important, Defendant's emphasis on the broad purposes of the Uruguay Agreements legislation is misplaced. The Supreme Court has observed that the "application of 'broad purposes' of legislation at the expense of specific provisions ignores the complexity of the problems that Congress is called upon to address and the dynamics of legislative action." *Board of Governors of Federal Reserve System v. Dimension Financial Corp.,* 474 U.S. 361, 373-374 (1986). Defendant should not be permitted to ignore the distinctive language set out in 35 U.S.C. § 154(c)(1), a provision that is designed to be broadly remedial.

Sixth, Defendant appears to contend that the determinations by the USPTO to grant Plaintiff only a 20-year term, rather than a 17-year term, are entitled to deference. Deft. Mem. 8-9. The USPTO has not issued regulations in this area, but even if it had, the Court of Appeals for

---

[13]  Plaintiff notes that the BPAI rendered a detailed Decision reversing virtually all of the examiner's extensive disallowances of Plaintiff's claims. A0232 through A0246. This reversal, obtained by Plaintiff appearing *pro se* before the BPAI, occurred in October 2001. Notwithstanding the extensive guidance offered by the BPAI's Decision, the USPTO took more than *three years* to issue the '311 Patent. The USPTO's dilatory handling of this matter, both before and after the sweeping reversal by the BPAI, is chronicled at A0015 through A0018. And subsequent to the events chronicled there, the USPTO's examiner further delayed the instant proceedings as described in A0009 through A0011. The string of errors would be humorous were it not for Defendant's effort, in this litigation, to compound those errors by limiting Plaintiff to a 20-year term running from January 11, 1994.

The astonishing delays that occurred in this case, coupled with the fact that the sweeping reversal of the examiner's disallowances was obtained by a *pro se* (i.e., "unsophisticated") inventor in a case involving a rather straightforward (albeit novel and nonobvious) mechanical device, raise serious questions about the good faith of the USPTO's handling of this case at the examination level, both before and after the appeal to the BPAI. Those questions, of course, are not at issue in this proceeding.

the Federal Circuit has held that they would not be entitled to deference because the USPTO has never been authorized by Congress to promulgate regulations that affect substantive rights. *Merck & Co. v. Kessler,* 80 F.3d 1543, 1549-1550 (Fed. Cir. 1996); 35 U.S.C. § 2(b)(2)(A) (limiting the USPTO to rulemaking that is directed to "the conduct of proceedings in the [USPTO]" and "not contrary to law"). Defendant's argument that its "interpretation of its own regulations is entitled to substantial deference" (Deft. Mem. 8) is simply beside the point, as he cites no regulations that bear on the issue under § 154(c)(1).[14]

The USPTO's decision on 17-year versus 20-year issue is set out in its Decision on Petition for Patent Term Adjustment, dated July 11, 2006. (A0006-A0008; a copy is also attached to the First Amended Complaint as Exhibit 5.) The reasoning set out in that letter on the issue is thin, to say the least. *See* the last paragraph on A0007 and the first three paragraphs on A0008. The USPTO's letter is tainted with plain error. At the bottom of A0007, the following paragraph appears:

> "Original" is used in the patent statute and rules to refer to an application, which is not a reissue application. An original application may be a first filing or a continuing application. See MPEP 201.04(a). Since the above-identified application was filed after June 8, 1995, on May 22, 1996, it is not eligible for a 17-year patent term by the clear terms of the statute.

Plaintiff is unaware of an use of the term "original" "in the patent statute." Contrary to the USPTO's letter, that term appears nowhere in the relevant statutory provisions, discussed above.

No deference is owed to the USPTO's Decision on Petition for Patent Term Adjustment.

---

[14]   Nor did the USPTO's Decision on Petition for Patent Term Adjustment, dated July 11, 2006, cite any regulations as support for the decision to deny Plaintiff a 17-year term. A0006-A0007.

**K.**  In sum, Plaintiff's reading of 35 U.S.C. § 154(c)(1) is supported by its language and by the language of surrounding provisions enacted at the same time; by § 121; by policy and equity; by Constitutional considerations; and by cardinal rules of statutory construction. Accordingly, Plaintiff is entitled summary judgment in his favor, holding that his '311 patent has a 17-year term running from the date of issuance.  Defendant's motion for summary judgment on that issue should be denied.

**III.  Defendant's Motion to Dismiss for Lack of Subject-Matter Jurisdiction Is Meritless**

Defendant argues, in the alternative, that there is no jurisdiction for the Court to issue an "advisory opinion" whether the 17-year term applies.  Deft. Mem. 19, 21.  Defendant also argues that the USPTO had no jurisdiction to issue an opinion of that nature.  Deft. Mem. 19. These arguments are meritless.

The fact is, the USPTO Decision on Petition for Patent Term Adjustment, dated July 11, 2006, concluded that "[s]ince the above-identified application was filed after June 8, 1995, on May 22, 1996, it is not eligible for a 17-year patent term by the clear terms of the statute."  That letter is part of the administrative record that Defendant filed.  A0006-A0008.  As part of the USPTO's file, that letter will be available to any member of the public – particularly to persons or entities who might be interested in obtaining an assignment of or license to the '311 Patent.

The '311 Patent itself shows that the USPTO determined that Plaintiff is not entitled to a 17-year term.  That patent (attached to the Complaint as Exhibit 1), on its first page, contains the following "Notice":  "Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1139 days."  This statement was a determination that Plaintiff is not entitled to a 17-year term.  The version of 35 U.S.C. § 154 that existed before the Uruguay

Agreements legislation was enacted in late 1994 did not provide for any extension or adjustment of a term by 1139 days. Under the former regime, the 17-year clock began to run from the day of the issuance of the patent, so there is no need to extend or adjust the term for delays that are attributable to the USPTO. *See* Deft. Mem. 20 ("[P]atent term extensions or adjustments have no applicability to the term of a patent measured from the issue date [i.e., patents entitled to a 17-year term] because prosecution delays do not affect the 17-year term"). The USPTO has taken a position on the face of the issued '311 Patent that a 20-year term, not a 17-year term, is applicable.

If this were not enough, the USPTO issued on August 12, 2004, with respect to Plaintiff's '311 patent, a Determination of Patent Term Extension under 35 U.S.C. 154(b) (application filed after June 7, 1995 but prior to May 29, 2000)" A0107. This Determination was thus expressly keyed to the effective date of the Uruguay Agreements legislation – legislation that, the USPTO contends, gives Plaintiff a 20-year term and not a 17-year term. That Determination stated that "[a]ny patent to issue from the above-identified application will include an indication of the 1139 day extension on the front page [of the patent]." A0107. This Determination document, having determined that Plaintiff was entitled to a 20-year term, as extended by 1139 days, necessarily determined that Plaintiff was not entitled to a 17-year term. Either a 20-year term or a 17-year term applies to a patent -- not both.

Amazingly, Defendant contends (Deft. Mem.20-21):

It is beyond the role of the PTO to grant requests for a 17-year term. Whether a patent is entitled to a 17-year or a 20-year term is not decided by the USPTO, instead, it occurs automatically by operation of law.

*       *       *       *       *       *

> It is never the PTO's role to declare whether a certain patent is entitled to a 17-year or a 20-year term. Disputes may sometimes arise between plaintiffs [inventors] and third parties regarding the enforcement of a patent, and at that time, the entitlement to a 17-year term might be an issue. Now, however, any decision by this Court regarding plaintiff's entitlement to a 17-year term would amount to an advisory opinion.

The statement about the USPTO's role respecting determinations of a patent term is plainly false. The record in this case, including the issued '311 Patent, shows that the USPTO does in fact make determinations that a patent is entitled to a 20-year term – and those determinations necessarily determine that the patent is not entitled to a 17-year term. Section 154(b)(3)(B), as amended by the Uruguay Agreements legislation, clearly contemplates that adjustments would be made by the USPTO to a 20-year term, as Defendant's Memorandum admits. Deft. Mem. 12.

Section 154(b)(3)(B) put the USPTO in the business, whether it likes it or not, of making determinations as to patent terms. As this case illustrates, patents that that straddle, in one way or another, the effective date of the Uruguay Agreements legislation, require the USPTO to make a determination whether a 17-year or a 20-year term applies.

When the USPTO makes a determination of that nature, it has a very real impact on an inventor because of the deference that USPTO determinations may enjoy (if they are persuasively reasoned). It may well be that a dispute over the term of a patent will arise between an inventor (or an assignee or licensee) and a third party. That dispute may very well end up in court. In that suit, the determinations made by the USPTO will be invoked by one litigant or the other. The court in that suit will then be faced with determining both the deference (if any) to which the USPTO's determination is entitled, and what the correct answer is with respect to the term of the patent.

It would not be surprising to see a party contend in that litigation that the inventor should not be permitted to take a position that is at odds with the USPTO's determination as to the patent term, if the inventor failed to challenge that determination in a suit like the one that is now before this Court. That is, the party who is adverse to the inventor may contend that 35 U.S.C. § 154(b)(3) provided a remedy for the inventor if the inventor was dissatisfied with the USPTO's determination – and that remedy was exclusive. (In line with this, Defendant does not dispute that this Court has jurisdiction over Plaintiff's case to the extent that it challenges, alternatively, the USPTO's computation that the 20-year term should be extended by 1139 days.) Thus, when the Uruguay Agreements legislation necessarily put the USPTO in the business of determining whether (1) a patent should have 20-year term under the law and (2) the number of days by which that 20-year term should be adjusted or extended, that legislation also necessarily put the USPTO in the business of determining whether a patent that straddles the effective date of the legislation should have a 17-year term.

Plaintiff is not asking the Court to render an advisory opinion. Plaintiff is asking the Court to determine that Plaintiff is, contrary to the various written determinations by the USPTO, and contrary to what is stated on the face of Plaintiff's patent, entitled to a 17-year term. If 35 U.S.C. §154(b)(4) somehow does not give the Court jurisdiction over that element of this case, then surely 28 U.S.C. §§ 1331 and 1338(a) (the other jurisdictional statutes cited in paragraph 3 of the First Amended Complaint) do.

For all of these reasons, Defendant's motion to dismiss for lack of subject-matter jurisdiction is meritless and should be denied.

**IV.  If Plaintiff Is Not Entitled to a 17-Year Term Running from the Date of Issuance, Plaintiff Is, in the Alternative, Entitled to Additional Adjustments to the 20-Year Term for Delays Occurring Before the Examiner**

**A.  The Effective Date of the Patent Term Guarantee Act of 1999.**

Plaintiff has shown above that he is entitled to a 17-year term, running from the date on which coverage is granted.  But if it somehow is determined that Plaintiff is entitled only to the 20-year term, the adjustments to that term that were made by the  USPTO in the Determination of Patent Term Extension were insufficient.  Under the USPTO's analysis, none of the extraordinary delay occurring during the examination process was permitted to extend the term of Plaintiff's patent, leaving Plaintiff with a patent term that extends for only about 12.5 years from the date of issuance.  That view cannot be correct, and is not equitable.

The USPTO's view seems to be that the only delay that may be taken into account to extend the 20-year term is the delay that is explicitly described in 35 U.S.C. § 154(b) as it existed before amendment by the Patent Term Guarantee Act of 1999, Pub. L. 106-113, 106th Cong., 1st Sess., 113 Stat. 1501A-557 ("Term Guarantee legislation").  In particular, the USPTO seems to hold the view that the only extensions of term that may be granted to Plaintiff are those found in 37 C.F.R. § 1.701, which sets out the USPTO's interpretation of 35 U.S.C. § 154(b) as it existed before amendment by the Term Guarantee legislation.  Under the USPTO's view, the only adjustments that can be made to Plaintiff's 20-year term are adjustments for delays attributable to appellate review by the BPAI.

The USPTO's view is incorrect. The correct view (if Plaintiff is not entitled to a 17-year term) is that Plaintiff is entitled not only to the extensions for delays attributable to appellate review as provided by former 35 U.S.C. § 154(b)(2) and by current 35 U.S.C. § 154(b)(1)(C), but also to the extensions provided for the violation of the "[g]uarantee of prompt Patent and Trademark Office responses," set out in 35 U.S.C. § 154(b)(1)(A) as amended by § 4402 of the Term Guarantee legislation. When the guarantee of prompt responses, conferred by the Term Guarantee legislation, is applied to Plaintiff's situation, it is clear that Plaintiff is entitled to a term extension of 1798 days, as set out below.

There is no merit to the USPTO's view that the guarantee of prompt responses (found in current 35 U.S.C. § 154(b)(1)(A)) is inapplicable to Plaintiff's patent because his application was filed before May 29, 2000. *But see* 37 C.F.R. §§ 1.701 and 1.702(f) (purporting to limit the applicability of the statutory guarantee of prompt responses to patent applications filed on or after May 29, 2000).

First, the Term Guarantee legislation is obviously remedial. The guarantee of prompt responses, set out in 35 U.S.C. § 154(b)(1)(A), was designed to remedy the unfairness of reducing the effective term of an Plaintiff's patent by unwarranted delays by the USPTO. Statutes that are remedial are to be liberally construed to achieve their remedial purposes. *See, e.g., State Farm Fire & Casualty Co. v. Tashire,* 386 U.S. at 533 (remedial statutes are to be liberally construed in favor of the beneficiary); *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. at 353 (same); *Fleisher Engineering & Construction Co. v. United States,* 311 U.S. at 18 (same). This is especially true for statutes that have implications for an Plaintiff's Constitutional rights. Plaintiff's case provides a perfect illustration of the type of egregious delays that were targeted by the statutory guarantee of prompt responses.

A careful reading of the effective date provision governing § 4402 of the Term Guarantee legislation provides powerful support for Plaintiff's view that he is entitled to the benefit of the statutory guarantee of prompt responses as well as to extensions for the delay associated with Plaintiff's appeal to the BPAI. In pertinent part, that provision states as follows (italics added):

**Sec. 4405. EFFECTIVE DATE**.

(a) AMENDMENTS MADE BY SECTIONS 4402 AND 4404.— *The amendments made by sections 4402 and 4404 shall take effect on the date that is 6 months after the date of the enactment of this Act and*, except for a design patent application filed under chapter 16 of title 35, United States Code, shall apply to any application filed on or after the date that is 6 months after the date of the enactment of this Act.

The interpretation of § 4405(a) to which the USPTO and 37 C.F.R. §§ 1.701 and 1.702(f) adhere completely ignores the first clause of § 4405(a) – all of the italicized words of the statute that appear before the word "and." This construction of § 4405(a) cannot be correct because it violates two fundamental tenets of statutory construction. First, a statutory interpretation that renders a part of the statute superfluous is disfavored. *See, e.g., Duncan v. Walker,* 533 U.S. at 174-175 (observing that this is a "cardinal rule" of statutory construction). Second, statutes that have a remedial purpose are to be liberally construed in favor of the intended beneficiaries.

The interpretation implicitly given to § 4405(a) by 37 C.F.R. §§ 1.701 and 1.702(f) is not entitled to any deference at all. Sections 1.701 and 1.702(f) are invalid because they establish substantive rules. The rules set out in these regulations could hardly be more substantive – they purport to control the term of an Plaintiff's patent coverage, the scope of the monopoly. The

USPTO, however, has no power to establish substantive regulations; its rulemaking power is limited to regulations, "not inconsistent with law," that are directed to "the conduct of proceedings in the [USPTO]."  35 U.S.C. § 2(b)(2)(A).  Of course, this must be the law because the Constitution gives *Congress,* not the Executive, the power to establish the scope of the patent monopoly, and any effort by Congress to delegate that authority to the Executive would be of dubious legality.  The most that Defendant can argue is that its regulations should be entitled to such minimal respect as arises from the thoroughness of its consideration of the statute and the validity of its reasoning. *See Merck & Co. et al. v. Kessler*, 80 F.3d at 1549-1550.  But as we shall see, these regulations reflect consideration that was plainly insufficient and reasoning that is plainly incorrect, so the Constitutional point is mooted.

Sections 1.701 and 1.702(f) take the simplistic view that the statutory guarantee of prompt responses applies only to applications filed on or after the date that is 6 months after the date of the enactment of the Term Guarantee Act legislation (that is, any application filed on or after May 29, 2000).  But § 4405(a) does not say that.  Instead, it says that the Act "shall take effect on [May 29, 2000] *and* . . . shall apply to any application filed on or after [May 29, 2000]."  (Emphasis added.)

Had Congress intended that the Act should have no effect upon applications filed before May 29, 2000, Congress would have said simply that it "shall apply to any application filed on or after [May 29, 2000]" – and stopped there.  But Congress did not do that.  Instead, Congress *also* provided, in the first half of the provision, that the Act "shall take effect on [May 29, 2000]."  The interpretation of § 4405(a) offered by these regulations and Defendant thus renders the first half of § 4405(a) – all of the language before the word "and" -- superfluous.

Plaintiff reads § 4405(a) in a very different way – a way that gives effect to *all* of the words of the statute. In Plaintiff's view, the statute provides for all of the various guarantees and adjustments provided by the Term Guarantee legislation to be effective upon the a date that was six months after enactment -- except for those guarantees and adjustments that focus upon the pendency of the application (i.e., upon the lapse of time after its filing date). Plaintiff's reading avoids treating the first half of the statute as surplusage.

Plaintiff's reading makes sense when viewed against the structure of the Term Guarantee legislation. Section 4402(a) of the legislation consists of three elements that provide protection to Plaintiffs.[16]  Some of the elements focus upon delays that are measured from the filing date of the application. For example, 35 U.S.C. § 154(b)(1)(A)(i) sets out a 14-month deadline that is measured from the filing date of the application. Similarly, the entire guarantee of no more than a three-year application pendency is keyed directly to the filing date of the application.

Most of delays addressed by the Term Guarantee legislation, however, are not measured from the filing date of an application. Thus, the guarantees set out in § 154(b)(1)(A) (ii), (iii), and (iv), are not keyed to the filing date of the application. Likewise, none of the guarantees or adjustments set out in § 154(b)(1)(C)(i), (ii), and (iii) is keyed to the filing date of the application.

---

[16] The first element is the "[g]uarantee of prompt Patent and Trademark Office responses," found in current § 154(b)(1)(A) (as enacted by § 4402(a)). The second element is the "[g]uarantee of no more than 3-year application pendency" found in current § 154(b)(1)(B) (as enacted by § 4402(a)). The third element consists of a "[g]uarantee or adjustment for delays due to interferences, secrecy orders, and appeals," found in current § 154(b)(1)(C) (as enacted by § 4402(a))

The largest new guarantee and adjustment provided by the Term Guarantee legislation was found in three-year "pendency guarantee" respecting the time within which the USPTO must issue patent (set out in 35 U.S.C. § 154(b)(1)(B) as amended).  Presumably, Congress recognized that the USPTO would have to make significant operational changes to enable it to routinely meet the three-year pendency guarantee, so it decided to make that guarantee purely prospective by providing that the legislation was effective with respect to patent applications filed on or after six months from the date of the enactment of the new legislation.  (Another element of the new legislation that is keyed to the filing date of the application is found in 35 U.S.C. § 154(b)(1)(A)(i).)

By contrast, other guarantees provided by new legislation did not  appear likely to have a significant impact on the USPTO's operations.  The guarantees and adjustments found in 35 U.S.C. § 154(b)(1)(C) were found largely, if not wholly, in prior law, so the USPTO was well prepared to meet the requirements of these guarantees.  Similarly, the guarantees of prompt responses, found in 35 U.S.C. § 154(b)(1)(A), would not be expected to require large changes in the USPTO's operations (except the element requiring a response to the application within 14 months), as those guarantees merely codified standards that should have been practiced by the USPTO all along.  These guarantees were not keyed to the filing date of the application.

Thus, there was a good reason for Congress to distinguish, in § 4405(a), between the guarantees and adjustments in the Term Guarantee legislation that were keyed to the *filing date of the application* -- and those that were not.  It is this distinction that § 4405(a) appears to recognize.

The interpretation of § 4405(a) adhered to by Defendant and set out in 37 C.F.R. §§ 1.701 and 1.702(f) renders superfluous a large part of the language § 4405(a), even though there was good reason for Congress express itself in the way it did. As noted above, it is a *cardinal rule* of statutory construction that statutes are to be interpreted in a way that does not render any of their words superfluous. *See, e.g., Duncan v. Walker,* 533 U.S. at 174-175.

Just as important, there was good reason for Congress <u>not</u> to have written § 4405(a) in the way that the examiner and 37 C.F.R. §§ 1.701 and 1.702(f) appear to interpret it. The delays experienced by Plaintiff, especially in the period following the remand from the BPAI, are egregious.[17] It is inconceivable that Congress intended that inventors in these circumstances should not have the benefit of this remedial legislation. As noted, remedial legislation is to be interpreted liberally in favor of the beneficiaries of the legislation. *See, e.g., State Farm Fire & Casualty Co. v. Tashire,* 386 U.S. 523, 533 (1967) (remedial statutes are to be liberally construed in favor of beneficiaries); *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 353 (1943) (same); *Fleisher Engineering & Construction Co. v. United States,* 311 U.S. 15, 18 (1940) (same).

Accordingly, Plaintiff is entitled to the benefit of all guarantees and adjustments provided by 35 U.S.C. § 154(b) that are not measured from the filing date of the application. In that the USPTO failed to allow Plaintiff the benefit of these guarantees, the USPTO's computation of the term extension was faulty.[18]

---

[17]   The egregious pattern of delays experienced by Plaintiff at the hands of the USPTO also constituted a violation of Plaintiff's constitutional rights to receive patent protection for his inventions. *See A.F. Stoddard & Co. Ltd. v. Dann,* 564 F.2d at 563-564.

[18]   The Examiner appears to have allowed the days that are due under former 35 U.S.C. § 154(b)(2) and current 35 U.S.C. § 154(b)(1)(C) – the provisions addressing delay due to

(continued…)

**B. The Proper Computation of a 20-Year Term.**

The proper computation of the adjustments to the 20-year term to which Plaintiff is entitled (in the event it is determined that Plaintiff is not entitled to the 17-year term requested above) is set out below.

37 C.F.R.§ 1.703(a) sets out a number of the factors to be considered in determining the period of adjustment under 1.702(a). Like 37 C.F.R. § 1.701(c)(3), 37 C.F.R. § 1.703(b)(4), sets forth the calculation that the term extension should be the number of days in the period beginning on the date on which the Notice of Appeal to the Board of Patent Appeals and Interferences was filed and ending on the date of the last decision by the Board of Patent Appeals and Interferences or a Federal court. That amount as correctly calculated in the Determination of Patent Term Extension under 35 U.S.C. 154(b) is 1,139 days.

In addition to the foregoing, there were, as mentioned above, significant delays in the prosecution of this proceeding, through no fault of the Plaintiff. After the BPAI reversed the examiner's rejections on October 30, 2001 (A0232), it took the USPTO eleven months, until September 30, 2002, to issue the next Office Action. (A0221 –A0227.) In this connection, 37 C.F.R. 1.703(a)(5) states that the patent term is adjusted for any number of days that are larger than a date that is four months after the date of the final decision by the Board of Patent Appeals and Interferences and ending on the date of mailing of an action under 35 U.S.C. § 132. According to Plaintiff's calculation, that number of days is 215.

---

appellate review by the BPAI or a federal court. Plaintiff does not dispute that it is entitled to 1139 days for review by the BPAI, but contends that he is entitled, in addition, to 659 days for delay occurring before the Examiner.

In response to the Office Action dated September 30, 2002, Plaintiff filed an Amendment on January 29, 2003.  (A0202-A0220.)  37 C.F.R. § 1.703(a)(3) states that the patent term is to be extended by the number of days in the period beginning on the day after a date that is four months after the date of a reply in compliance with § 1.113(c) and ending on the date of the mailing of a Notice of Allowance.  In the present circumstances, a Notice of Allowance should have issued, and ultimately did issue, from the Amendment dated January 29, 2003. Unfortunately, it took almost nineteen months – until August 12, 2004  A0105-A0108. Excluding four months from that time span, by Plaintiff's calculation, is an additional 444 days.

Thus, Plaintiff's calculation leads to 1,139 days, plus 215 days, plus 444 days, totaling 1,798 days.  A revision of the determination of patent term extension from 1,139 days to 1,798 days is thus warranted (in the event that Plaintiff is somehow is ultimately determined not to be entitled to a 17-year term that Plaintiff seeks.

## CONCLUSION

Defendant's motions to dismiss and for summary judgment are meritless.  Plaintiff's motion for summary judgment, however, should be granted.  That is, Plaintiff has demonstrated that he is entitled to a patent term of 17-years (running from the date of issuance) with respect to

the '311 Patent.  In the alternative, if Plaintiff is held not to be entitled to a 17-year term, the

'311 Patent should have a 20-year term extended by 1798 days.

                                        Respectfully submitted,


                                        __/s/__ *Thomas D. Sykes*
                                        THOMAS D. SYKES, Pro Se
                                        239 Surrey Lane
                                        Lake Forest, IL  60045
                                        Tel:  (312) 984-7530
                                        Fax:  (312) 984-7700
                                        Email:  tsykes@mwe.com
                                        DC Bar No. 461071

Dated:  December 13, 2006

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that the foregoing document has this 13th day of December

2006 been made upon the following by electronic filing and through the Court's electronic

notification system:

Karen L. Melnik, D.C. Bar No. 436452
Assistant U.S. Attorney
United States Attorney's Office
Civil Division
555 Fourth Street, N.W., Rm 4-4112
Washington, D.C.  307-0338
(202) 307-0338


/s/ *Thomas D Sykes*
THOMAS D. SYKES, Pro Se
239 Surrey Lane
Lake Forest, IL  60045
Tel:  (312) 984-7530
Fax:  (312) 984-7700
Email:  tsykes@mwe.com
DC Bar No. 461071